# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 20, 2001 Session

## STATE OF TENNESSEE v. TAKEITA M. LOCKE

### Direct Appeal from the Criminal Court for Knox County
#### No. 67739B    Richard R. Baumgartner, Judge

---

### No. E2000-00923-CCA-R3-CD
### June 25, 2001

---

The defendant was convicted in the Knox County Criminal Court of especially aggravated robbery and felony murder. She timely appealed, arguing that the State had failed to show that statements she gave while a juvenile were admissible, that the trial court erred in not instructing as to lesser-included offenses or that the jury must find whether felony murder was a "natural and probable consequence" of especially aggravated robbery, and that the evidence was insufficient to sustain the convictions. Based upon our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Wade V. Davies (on appeal) and Gerald Lee Gulley, Jr. (at trial), Knoxville, Tennessee, for the appellant, Takeita M. Locke.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Takeita M. Locke, was convicted in the Knox County Criminal Court of felony murder and especially aggravated robbery. She appealed her convictions, presenting the following issues:

> I.    The State failed to carry its burden to show that statements taken from the defendant as a juvenile after a warrantless arrest and in the absence of counsel or parental permission were constitutionally valid;

II.    The trial court erred by not instructing the jury on the lesser-included offenses of reckless homicide, criminally negligent homicide, facilitation of especially aggravated robbery, and aggravated robbery and by not giving a "probable and natural consequences" instruction as part of the criminal responsibility charge; and

III.    The evidence was insufficient to convict the defendant of first degree murder and especially aggravated robbery.

Based upon our review, we affirm the defendant's convictions for especially aggravated robbery and felony murder.

## FACTS

The State's first witness, Dr. Sandra K. Elkins, the Knox County Medical Examiner, testified that the victim, Chuck Newman, died as the result of a stab wound to the heart. Her examination showed that he had bruises on his arms, curved lacerations on the top and backside of his head, and bruising and swelling around his left eye. The victim tested positive for cocaine.

Karen Verklas testified that she lived at the Montgomery Village Apartments housing project in Knox County. She said that she was at home on October 17, 1998, with her fiancé, Robert Richards, when the victim knocked on her door between 4:30 and 5:00 a.m. As she opened the door to let the victim in, Jerry Graves, whom she knew as "Bam," pushed his way into the apartment and said that he needed to talk with the victim. He then cornered the victim in the kitchen and said, "Give me the money, Bitch." Verklas saw Graves produce a pistol, and he and the victim began struggling, going into the living room and onto the couch. She saw the defendant, whom she knew as "Cherry," coming in the apartment as she was leaving to summon help. Verklas testified that the defendant then went to the couch, where Graves and the victim were struggling:

Q.    All right. When she came in, do you recall where she went?

A.    Yeah, she went to the – uh – the head part of Chuck, and bent over, and she was trying to pries [sic] his hand open. While Bam was on him, she was trying to pries [sic] his hand open, and both of them would say, "Give me the money."

She then left the apartment, leaving the victim with Graves and the defendant.

Verklas had to go to a neighbor's to call 911 because her phone was not working. She then went back to her apartment and saw Graves and the defendant coming out. She said that the defendant was "wiping her hands off." Verklas testified that in the statement she gave to the police, following the incident, she had also said that she heard the defendant, as she was trying to pry open

the victim's hand, say, "You are going to get it. You will get the damn money[.]" She saw the victim leaning on the doorway with blood all over him. She described his appearance:

> A. You couldn't really see his face, he was beat so bad bloody. I was scared. I went to get a towel to wipe his face off, but you couldn't get the blood to come off his face, he was so full of it. His jaws and stuff right through here was bruised already. You couldn't tell.
>
> Q. Could you see him at that point in time bleeding from anyplace else?
>
> A. I couldn't tell where the blood was coming from, to be honest with you, he was bleeding so bad.

The victim told her, "Oh, God, Karen, they have done me good this time." Verklas testified that, by this point, the victim was doing "[n]othing. His eyes was [sic] rolling back in his head; blood was just a gushing."

Officer Mark Waggoner of the Knoxville Police Department came to the apartment as the result of the 911 call. He retrieved a knife at the scene, but was not able to process the handle for fingerprints because the texture of the handle was too rough.

Samuel Brown, an investigator with the Knoxville Police Department, testified that as he arrived at the crime scene that morning, other officers were already present, as were Verklas and Richards. Later, he questioned both of them at the Knoxville Police Department and learned that the defendant had the nickname "Cherry." He then contacted the defendant's mother who told him that when she found the defendant, she would bring her to the police department. However, the defendant was arrested by other officers and taken to the juvenile facility.[1] Brown went to the juvenile facility where the defendant was being held and interviewed her at approximately 3 p.m. on October 18, 1998. He returned the following day and again interviewed her. After the first interview, Brown interviewed Adam Faw, who later pled guilty to especially aggravated robbery. Because of inconsistencies in the defendant's first statement and that given by Faw, Brown made the second trip to interview the defendant.

Robert Richards testified that he was the fiancé of Karen Verklas and that they lived together. The victim had come to Verklas's apartment the evening of October 16, 1998, and left at approximately 11 p.m. Early the next morning, between 4:30 and 5:00 a.m., as Richards and Verklas were still awake, they heard a knock at the door, and Richards recognized the victim's voice. Verklas opened the door and the victim came in. A man whom Richards knew from the

---

[1] Because the defendant was seventeen years old at the time of the incident, she was taken to a juvenile detention center.

neighborhood as "Bam" also came in as Verklas was closing the door, pushing the victim into the kitchen and saying, "Just give me the money." Richards heard a noise that sounded "like a shell being chambered in a gun" and saw the victim and "Bam" come out of the kitchen wrestling, ending up on the couch. The victim was on his back with "Bam" on top of him. "Bam" was hitting the victim in the head. Richards was getting ready to leave the apartment to find a pay phone to call for help as "Bam's" girlfriend, "Cherry," came in the apartment. She started trying to pry open the victim's hands as "Bam" was swinging at him and asked "Bam," "How much [money] has he got on him?" Richards did not see whether the victim had been stabbed as he left the apartment. He went to his truck and saw "Bam" and "Cherry" come out of the apartment. He saw the victim, who was covered in blood, stagger to the door of the apartment.

### Defense Proof

Melvina Terry, a resident of the Montgomery Village Apartments, testified that she knew the victim because he had been there before to buy drugs. She saw the victim go up to Verklas's apartment and then saw the defendant drive up with Jerry Graves and a white male. Graves and the other man followed the victim into the apartment, the defendant remaining outside and talking with Ms. Terry. Approximately fifteen minutes later, she heard someone screaming, "Please, stop, stop," and the defendant then ran to the apartment. About five minutes later, the defendant came out of the apartment, followed by a white female, and one of them said, "They are killing him." About three or four minutes after that, Graves emerged from the apartment carrying a gun. Graves said, "If anybody tell anything, I will kill you-all, too." Graves, the defendant, and the white male then got into a car and "screeched off." The victim came out of the apartment "bleeding all over the place."

The defendant's mother, Mary Ann Bell, testified that she had seen the defendant the day before the victim was killed, and the defendant was with her boyfriend, Jerry Graves, Adam Faw, and Faw's girlfriend. Graves had been drinking. She said that after police officers had come to her house, she called Investigator Sam Brown and told him that she was turning the defendant in. Officers then came to her house and took the defendant. She asked if she could go with the defendant but was told that she could not. She told officers not to question the defendant unless she or a lawyer was present because the defendant could not read or write or understand what was happening.

Ms. Bell further testified that the defendant and Graves had been dating since the defendant was thirteen years old but Graves was "already a fully grown man then." The defendant used to come home with bruises after Graves had beaten her. She had seen Graves hit the defendant in the head with a gun and stab her in the back with scissors. He once shot at Ms. Bell after she had tried to stop him from hurting the defendant.

The defendant testified that Graves had come to her apartment on the evening of October 16, 1998, at about 7:00 p.m. and stayed until 10:00 p.m. He left to visit Adam Faw and when he did not return, the defendant went to Faw's apartment, which was nearby. Faw's girlfriend, Christina Martin, was there when the defendant arrived, as were Faw and Graves.

-4-

Earlier that same day, Graves had gone to the Montgomery Village Apartments and sold crack cocaine to Robert Richards for $15. To finish selling their cocaine, Graves and Faw again went to the parking lot of Montgomery Village at about 3 a.m., accompanied by the defendant and Martin. When they arrived, everyone except Martin, who was intoxicated, got out of the car. The defendant sat on nearby steps with Melvina Terry. Faw and Graves went to a different part of the parking lot and the victim drove up. The defendant saw Graves and Faw follow the victim, but she continued to talk with Terry.

The defendant testified that she heard talking and screaming coming from the direction of Karen Verklas's apartment. Verklas came running out and yelling. The defendant asked her what was happening. The defendant then went to the apartment, looked in the door, and heard Graves and Faw talking about the "gun piece" they had dropped. She saw the victim, who was bleeding, come from the apartment. She then returned to the area where she had been talking with Terry, and Graves and Faw came to the parking lot. Graves took her by the shirt, pulled her into the car, and they then left.

The defendant was taken to the Juvenile Detention Center where Investigator Sam Brown came to interview her. She wrote out her first statement to him on October 18, 1998. He returned the following day, telling her that the victim had died, and that she was going to prison. She testified that he wrote out the second statement and had her sign it.

The defendant also testified that Graves had given Robert Richards some cocaine a week or so prior to the victim's murder, and Richards had not paid for it. The defendant said that when she confronted Richards about the money he owed, she hit him in the face and broke his glasses. She also had a problem with Karen Verklas, who was supposed to be selling cocaine for one of the defendant's friends, but had been smoking the cocaine instead. The defendant admitted that she was in the drug-selling business with Graves.

The audiotape of Verklas's 911 telephone call was played for the jury as part of the defense proof. The following was said during this call:[2]

DISPATCHER: KNOX COUNTY 911.

VERKLAS: Yes, I need an ambulance and the police, please, and hurry.

DISPATCHER: What is your address?

VERKLAS: 4712 Joe Lewis, Apartment 229.

---

[2]We have set out this call in its entirety because the defendant argues on appeal that Verklas did not tell the dispatcher of certain matters to which she testified at trial.

DISPATCHER: What is your problem there?

VERKLAS: I had a friend come over and visit me and this dude come in behind him, pulled a gun on him, trying to rob him, and then he stabbed him. He's bleeding bad. Please, y'all get here quick.

DISPATCHER: Okay. Is the person still there?

VERKLAS: Yeah, he's out here. He can't go nowhere-- (indiscernible)

DISPATCHER: What's the apartment number again?

VERKLAS: 229.

DISPATCHER: Okay. What is your name, ma'am?

VERKLAS: Karen Verklas.

DISPATCHER: Is the person that stabbed him still there?

VERKLAS: No, but I know who it was. Y'all just hurry up and get here.

DISPATCHER: All right, ma'am, stay on the phone with me.

VERKLAS: Look, I'm going to put my neighbor here on the phone with you. I've got to get out here with him, okay?

DISPATCHER: Is this your boyfriend?

(Indiscernible)

DISPATCHER: Okay. Can you give me a description of the person who stabbed him?

NEIGHBOR: Oh, I have no idea. They just woke me up. You know, I'm not in on all of this.

DISPATCHER: What part of the body is he stabbed in?

-6-

NEIGHBOR:      I have no idea.

DISPATCHER:    But you know his name, but you don't know what he looks like?

NEIGHBOR:      I have no idea of what's going on.  You know, they're all over there doing crack, you know, that's the bottom line.

DISPATCHER:    You don't know who did it?

NEIGHBOR:      Nope.

DISPATCHER:    Are you the lady that I was just talking to?

NEIGHBOR:      No.

DISPATCHER:    Okay.  What is her name?

NEIGHBOR:      Her first name is Karen is all I know.

DISPATCHER:    Okay.  She was just calling from your apartment?

NEIGHBOR:      Yeah.

DISPATCHER:    And he was robbed also?

NEIGHBOR:      That's what she said.

DISPATCHER:    Is there any way that you can find out what the other guy looks like?  Do you know how long ago this happened?

NEIGHBOR:      No, I have no idea.  Like I said, they just woke me up banging on my door.

DISPATCHER:    Are they outside or are they–

NEIGHBOR:      There's a bunch of people outside.

DISPATCHER:    What's the name of the apartment complex?

NEIGHBOR:      It's Montgomery Village.  Parking Lot Q.

DISPATCHER: Okay. Just stay on the line with me. (long pause) Just a minute, ma'am. (long pause) So, you don't know if he was robbed or what?

NEIGHBOR: Well, she just said that that was, you know, what was going on. I don't know if they actually did it.

DISPATCHER: Who?

NEIGHBOR: I don't know if they actually robbed him. She said that was what they were trying to do.

DISPATCHER: Okay. I've got people on the way. (Long pause) What is your phone number there, ma'am?

NEIGHBOR: 609-1679. I mean, you know this did not happen at my house.

DISPATCHER: Right.

NEIGHBOR: Okay.

DISPATCHER: Is there still a bunch of people out there?

NEIGHBOR: Yeah. You know, somebody knows who did it.

DISPATCHER: Um-hum.

NEIGHBOR: But whether they'll tell you or not is a whole other story.

DISPATCHER: Yeah.

NEIGHBOR: I hear 'em. I think the police is here.

DISPATCHER: Okay. I'll let you go then.

NEIGHBOR: Okay.

DISPATCHER: Okay. Thank you.

Adam Faw testified as a rebuttal witness. He was seventeen years old at the time of the instant offenses. He said that he had been with the defendant, Graves, and Christina Martin, his

former girlfriend, during the early morning of October 17, 1998. Faw was driving the four of them in his mother's car. He and Graves discussed committing a robbery. They went to the Montgomery Village Apartments and Graves asked for Faw's pistol, a .380 semi-automatic, which Faw then gave to him. Graves went into Verklas's apartment by himself, and Faw believed that he recalled seeing the defendant by herself at the apartment dumpster. He saw the defendant run into Verklas's apartment after he had heard the commotion coming from it. Faw said that he did not go into Verklas's apartment. When Graves and the defendant returned to Faw's car, Graves had blood on his coat.

Lawrence Libscombe, an officer with the Knoxville Police Department Organized Crime Unit, testified as the last rebuttal witness. He said that the defendant had come to his office voluntarily on the Monday before the trial began. When he learned that she was on her way, he checked her record and found that she had a pending murder charge. When he asked her about the charge, she said that she had nothing to do with it, that she had been at the scene with her boyfriend and heard someone yell, "Stop! Don't do this," as she was sitting in the car. She then went to see what was happening and saw her boyfriend beating another person with a handgun and trying to get money out of his hand.

## ANALYSIS

### I. Admissibility of Defendant's Statements

The defendant contends that her statements were not admissible, both because she was arrested without probable cause and because her statements were not voluntary. The State contends that this issue is waived because the only challenge to the statements at the trial court level was that they were taken without the permission of the defendant's mother. According to the State, the defendant cannot present on appeal new challenges to the statements.

During the transfer hearing in the Knox County Juvenile Court, proof had been presented as to the defendant's statements to investigating officers. Sam Brown, a major crimes investigator with the Knoxville Police Department, testified as to the statements he took from the defendant. Brown first met with the defendant on October 18, 1998, while she was confined at the Knox County Juvenile Court facility, and read her rights to her. He next spoke with the defendant the following day. This time, he read the defendant's rights to her, and she initialed and signed a waiver of rights.

Prior to the picking of the jury, defense counsel made an oral motion in the Knox County Criminal Court, where the matters against the defendant were to be tried, to suppress the defendant's statements to investigating officers. The precise issue, as stated by the trial court and agreed to by defense counsel, was "not that they failed to Mirandize or obtain a voluntary statement, but rather you claim that parental consent was not given." Citing Colyer v. State, 577 S.W.2d 460 (Tenn. 1979), the trial court denied the motion to suppress. In the defendant's motion for new trial, she both challenged the sufficiency of the evidence and claimed that the trial court had erred in concluding that her statements were admissible: "The trial court erred by admitting certain statements of the

Defendant, given while the Defendant was a minor in custody and taken without permission of the Defendant's mother, when said statements were taken in violation of the Defendant's constitutional rights against self-incrimination."

Thus, prior to the appeal of this matter, the defendant's complaint was that her statements were inadmissible because they were taken without the permission of her mother. However, on appeal, the defendant has made additional objections to the statements, claiming, in addition to her original grounds, that the statements were inadmissible because she was arrested without probable cause and because she had not voluntarily waived her Miranda rights. As relief, the defendant seeks a new trial or, in the alternative, a remand to the trial court for a hearing on these claims.

In support of her argument that this matter should be remanded to the trial court for a hearing as to whether her statements were lawfully obtained, the defendant has cited instances in which this court has made such a remand. In State v. Robert Blocker, No. E1999-01624-CCA-R3-CD, 2000 WL 726447, at *3 (Tenn. Crim. App. June 5, 2000), perm. to appeal denied (Tenn. Jan. 8, 2001), the defense counsel had raised as issues at the suppression hearing "whether the officers advised the defendant of his Miranda warnings prior to his pretrial statement, and whether he was coerced and intimidated into making the statement." In view of the fact that the trial court had not had the opportunity to address the suppression issue previously raised before it and whether the ruling was affected or changed by the trial testimony, the matter was remanded to the trial court for a hearing on that issue.

In State v. Keith Slater, No. 01C01-9709-CC-00435, 1999 WL 32912 (Tenn. Crim. App. Jan. 27, 1999), aff'd after remand, No. M2000-00486-CCA-R3-CD, 2001 WL 487692 (Tenn. Crim. App. May 8, 2001), we remanded for another suppression hearing because no finding had been made as to the conflicting claims during the first hearing regarding whether the defendant had asked that an attorney be contacted before giving a statement. Similarly, we remanded the suppression issue to the trial court in State v. William Chouinard, No. 03C01-9311-CR-00357, 1995 WL 50752 (Tenn. Crim. App. Feb. 9, 1995), because the court had not allowed the defendant to offer evidence at the motion to suppress as to his standing to make such a claim. Finally, in State v. Donald Johnson, Jr., No. W2000-00875-CCA-R3-CD, 2001 WL 298638 (Tenn. Crim. App. Mar. 28, 2001), we remanded to the trial court for further findings on the motion to suppress, the trial court's original findings being unclear on several important matters.

The arguments made by this defendant are unlike those made in cases in which there has been a remand to the trial court either for an additional hearing on a motion to suppress or for additional findings of fact and conclusions of law. Here, the sole legal issue presented by the oral motion to suppress the defendant's statements was whether they were inadmissible because her mother had not been present when the statements were taken. Although the defendant now takes an expansive view of this issue, arguing that the present claims were implicit within the issue presented by trial counsel, the fact is that the trial court heard no testimony before ruling on this matter because none was required, the matter being presented as an issue of law. The defendant asserts that it is "plain error" for the statements not to be suppressed. However, there is no proof to show that the defendant's

statements were taken in violation of her constitutional rights. The plain error doctrine does not allow a defendant to change theories and present an argument different from that made at the trial to obtain a remand and a hearing to determine if that second argument is valid. The cases cited by the defendant do not authorize a remand and an evidentiary hearing when there is no proof as to a constitutional violation of the defendant's rights. The sole basis presented by this defendant in the trial court was whether her rights could have been validly waived since her mother allegedly had instructed the investigating officers that the defendant was not to be questioned unless the mother was present. Unless the challenges made on appeal as to the statements are first raised before the trial court, they are waived for purposes of appeal. State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993); State v. Burtis, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983). "An appellant cannot change theories from the trial court to the appellate court." State v. Brewer, 932 S.W.2d 1, 9 (Tenn. Crim. App. 1996) (quoting State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)).

As to the statement made to Officer Libscombe, to which he testified as a rebuttal witness, the defendant on appeal argues that her right to counsel was violated by the taking of this statement. However, since no motion to suppress this statement was made at the trial court level, the issue is waived for purposes of appeal. Tenn. R. Crim. P. 12(b)(3); Strickland, 885 S.W.2d at 88; Burtis, 664 S.W.2d at 310.

This issue is without merit.

## II. Jury Instructions

The defendant was charged in a two-count indictment, the first count charging felony murder and the second charging especially aggravated robbery, and was convicted on both counts. As to the jury instructions given by the trial court, the defendant has made two claims of error.

### A. Instructions as to Lesser-Included Offenses

The defendant was charged with felony murder and especially aggravated robbery. The trial court instructed the jury as to felony murder, facilitation of felony murder, and especially aggravated robbery. Instructions were not given as to any other offenses. The defendant has presented as an issue on appeal that instructions should have been given as to criminally negligent homicide and reckless homicide on the murder charge and aggravated robbery and facilitation of especially aggravated robbery or aggravated robbery on the especially aggravated robbery charge.

In State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), our supreme court adopted the following test for determining what constitutes a lesser-included offense:

> An offense is a lesser-included offense if:
>
> (a)  all of its statutory elements are included within the statutory
>      elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

    (1) a different mental state indicating a lesser kind of culpability; and/or

    (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

    (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

    (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

    (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

The defendant was convicted of first degree felony murder, which is defined as follows:

> **First Degree Murder.** - (a) First degree murder is:
> (1) . . .
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]

Tenn. Code Ann. § 39-13-202(a)(2) (1997).

The Code defines criminally negligent homicide as "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a) (1997). "Reckless homicide" is defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (1997). Subsequent to the oral arguments in this case, our supreme court resolved the question of whether there were lesser-included offenses to felony murder, concluding, as the defendant argued herein, that reckless homicide and criminally negligent homicide are lesser offenses, under part (b) of the Burns test. State v. Ely, ___ S.W.3d ___, slip op. at 11-12 (Tenn. 2001).

-12-

However, applying the <u>Ely</u> holding, the issue is not resolved for we must then apply a two-step process to determine whether, under the facts, the trial court should have instructed as to criminally negligent homicide and reckless homicide:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

<u>Burns</u>, 6 S.W.3d at 469.

Karen Verklas testified that she saw Jerry Graves, armed with a pistol, and the victim struggling on the couch in her apartment. The defendant came into the apartment and was trying to pry open the victim's hand as Verklas ran out to summon help. She saw Graves and the defendant leave her apartment and saw the victim leaning in the doorway with blood all over him. He said to her, "Oh, God, Karen, they have done me good this time." Robert Richards, Verklas's fiancé, echoed her testimony, but added that he heard the defendant ask Graves as she was trying to open the victim's hand, "How much [money] has he got on him?" According to defense witness Melvina Terry, the defendant never entered the apartment where the victim was attacked, but stayed outside with her. The defendant's testimony was that she was with Terry in the parking lot and approached the apartment only to look in the door, when she saw Jerry Graves and Adam Faw emerging and talking about the "gun piece." Adam Faw's testimony as a rebuttal witness was that he and Graves talked, in the presence of the defendant and Faw's former girlfriend, about committing a robbery, and that Graves had gone into the apartment alone. The defendant ran into the apartment after Faw heard a commotion coming from it. Officer Libscombe, the second rebuttal witness, said the defendant told him that she had been at the murder scene with Graves and had seen Graves beating another person with a handgun and trying to get money out of his hand, but she had had nothing to do with the crimes.

Dr. Sandra Elkins, the Knox County Medical Examiner, testified that, during the autopsy, she observed three wounds to the victim's head. The most anterior wound was described as "on the front of his scalp and had gone down to the skull and actually fractured the outer part of the skull." This wound would not have been fatal but would have dazed the victim or made him unconscious. The other wounds to his head were consistent with having been made with a blunt object, such as the butt of a pistol. She observed bruising of the victim's left eye, two bruises above the left elbow, one below the left elbow, and one below the right elbow. The victim had a 3.55-inch stab wound to his chest, which penetrated his heart and caused "severe bleeding."

-13-

Based upon this evidence, we cannot conclude that there was any proof that the death of the victim was a criminally negligent homicide resulting in death or that it was a reckless killing. The proof was that he died as he was being robbed. Thus, regardless of the fact that the defendant's responsibility for this offense was established through the doctrine of criminal responsibility, it remains that the varying descriptions of the homicide do not justify jury instructions as to criminally negligent homicide or reckless homicide.

Our supreme court has concluded "that an erroneous failure to instruct on lesser-included offenses is a constitutional error for which the State bears the burden of proving its harmlessness beyond a reasonable doubt." Ely, ___ S.W.3d at ___, slip op. at 17. The court in Ely then explained how this constitutional standard had been applied in State v. Williams, 977 S.W.2d 101 (Tenn. 1998):

> The jury in Williams was instructed not only on the charged offense of premeditated first degree murder, but also on the lesser-included offenses of second degree murder and reckless homicide. The error in failing to charge voluntary manslaughter was deemed harmless beyond a reasonable doubt because by rejecting the lesser offense of second degree murder, the jury clearly demonstrated its disinclination to convict on any lesser offenses, including voluntary manslaughter. Williams, 977 S.W.2d at 106.

Ely, ___ S.W.3d at ___, slip op. at 17-18.

In this matter, the jury was instructed both as to felony murder and facilitation of felony murder, a Class A felony, Tenn. Code Ann. §§ 39-11-117 and 39-11-403, and convicted the defendant of felony murder, rather than facilitation of felony murder, as they had the opportunity to do. Thus, in accord with Ely, we conclude that any error was harmless beyond a reasonable doubt, because it more probably than not did not affect the judgment to the prejudice of the defendant.

This claim is without merit.

The petitioner has also argued that, as to the charge of especially aggravated robbery, the trial court should have instructed as to the lesser offenses of aggravated robbery and facilitation of especially aggravated robbery and aggravated robbery. We agree that these are lesser-included offenses of especially aggravated robbery. In deciding not to charge these offenses, the trial court concluded:

> Let me make a couple of comments for the record with regard to the jury instructions, since I changed my mind after the discussion we had in the courtroom about them. I determined that – indeed, I did charge facilitation of first-degree murder, as you heard. I decided that there was no lesser – there was no proof to justify a charge of lesser

-14-

included offenses on especially aggravated robbery. There was absolutely no testimony to controvert the extent of injuries sustained by Mr. Newman or the fact that he was robbed. The only proof was to the effect that happened. If the jury believes that this defendant committed that offense or is criminally responsible for that offense, the only thing she could possibly be guilty of is especially aggravated robbery. Therefore, that is what I charged.

We agree with the trial court's analysis. Under the proof, the defendant was either guilty of especially aggravated robbery, or she was not. There were no facts in the evidence which, applying the second step of the <u>Burns</u> analysis, would justify the jury's being instructed on lesser robbery offenses. This assignment is without merit.

### B. Instructions as to Criminal Responsibility

After the briefs had been filed in this matter, but before the oral argument, counsel for the defendant advised this court that he wished to raise the additional issue that the jury instructions for criminal responsibility were deficient in that they did not include the charge that the jury must determine whether the homicide was the "natural and probable consequence" of the planned robbery of the victim. According to the defendant's argument, such an instruction was mandated by the holding of our supreme court in <u>State v. Howard</u>, 30 S.W.3d 271, 276-77 (Tenn. 2000). This claim was subsequently raised in oral argument. We will examine the defendant's contention that the jury charge for criminal responsibility was defective.

As for felony murder, charged in the first count of the indictment, the trial court instructed the jury:

> For you to find the defendant guilty of this offense in the first count, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendant unlawfully killed the alleged victim, Chuck Newman; and,
>
> (2) That the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery; that is, that the killing was closely connected to the alleged robbery and was not a separate, distinct and independent event; and,
>
> (3) That the defendant intended to commit the alleged robbery.
>
> The essential elements that constitute especially aggravated robbery are as follows:

(1)   That the defendant knowingly obtained or exercised control over property owned by Chuck Newman; and,

(2)   That the defendant did not have the owner's effective consent; and,

(3)   That the defendant intended to deprive the owner of the property; and,

(4)   That the defendant took such property from the person of another by the use of violence or by putting the person in fear; and,

(5)   That the defendant took such property intentionally or knowingly; and,

(6)   That the defendant accomplished this act with a deadly weapon or by display of an article fashioned or used to lead the alleged victim to reasonably believe it to be a deadly weapon; and,

(7)   That the alleged victim suffered serious bodily injury.

"Intentionally" means a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

As to the issue of criminal responsibility, the trial court instructed as follows:

The defendant is criminally responsible as a party to the offense of felony murder if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The defendant is criminally responsible for an offense committed by the conduct of another, if acting with the intent to promote or assist in the commission of the offense or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

Before you find the defendant guilty of being criminally responsible for said offense committed by the conduct of another, you must find

-16-

that all the essential elements of said offense have been proved by the State beyond a reasonable doubt.

These instructions were taken verbatim from the Tennessee Pattern Jury Instructions then in effect. However, that does not end our inquiry, for pattern jury instructions are sanctioned by neither our supreme court nor the Tennessee Legislature. State v. Phipps, 883 S.W.2d 138, 152 (Tenn. Crim. App. 1994). On occasion, our supreme court has determined that the pattern jury instruction is defective, resulting in the court, itself, promulgating an appropriate instruction. State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995) (instruction as to "identity").

In State v. Howard, 30 S.W.3d 271 (Tenn. 2000), our supreme court considered a similar claim to that made in the instant appeal regarding jury instructions for criminal responsibility given by the trial court. In Howard, the defendant and three others, all wearing ski masks, approached the rear entrance of a restaurant, a faithless former employee having given them information about the restaurant's closing procedures. Each brandishing a pistol, the four men encountered an employee at the rear door of the restaurant and ordered him back inside. The restaurant manager was shot and killed, while another employee was seriously injured by multiple gunshots. Howard gave a statement to police officers admitting that he had accompanied the three other men to the restaurant knowing it was their intention to rob it and that all three of them had guns. He did not say whether he also had a gun. He said that he stayed in the back of the restaurant and, upon hearing gunshots, ran back to the car. The others followed him and one of them said, "I shot him, man, I shot him." Id. at 274. No evidence was presented that Howard had shot either of the victims. The trial court gave an instruction as to criminal responsibility which was nearly identical to that given in the instant case. Following Howard's conviction for premeditated first degree murder, especially aggravated robbery, and conspiracy to commit aggravated robbery, he appealed, arguing, *inter alia*, the trial court had erred in not instructing the jury as to the natural and probable consequences rule. In accepting the appeal from this court, our supreme court stated the sole issue for its consideration: "whether the natural and probable consequences rule can be used to sustain a defendant's conviction for first degree premeditated murder based upon criminal responsibility for the conduct of a co-defendant during an especially aggravated robbery." Id. at 275.

Noting that the natural and probable consequences rule had survived the codification of the common law into the Tennessee criminal responsibility statutes, the court set out what the State must prove to establish criminal liability:

> Thus, to impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime. Id. at 276.

Since the jury in <u>Howard</u> was not instructed as to the natural and probable consequences rule, and, thus, "did not have the opportunity to determine whether this element was proved," Howard's conviction for premeditated murder was reversed and remanded for a new trial. <u>Id.</u> at 277. Although a harmless error analysis was utilized, the court could not determine beyond a reasonable doubt that, absent the error, the jury verdict would have been the same.

In an earlier ruling on the same issue, our supreme court determined in <u>State v. Carson</u>, 950 S.W.2d 951 (Tenn. 1997), that the Tennessee Legislature, in enacting the Criminal Sentencing Reform Act of 1989 of which Tennessee Code Annotated Section 39-11-402(2) (1989) was a part, codified the common law principle that if a person agrees to commit a crime with another, that person "is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof." <u>Id.</u> at 954 (quoting <u>Key v. State</u>, 563 S.W.2d 184, 186 (Tenn. 1978)). Accordingly, in <u>Carson</u>, the court affirmed the convictions of the defendant Carson for aggravated robbery, this being the crime which he had helped his co-defendants to plan, as well as for aggravated assault and felony reckless endangerment, which were committed by the co-defendants while Carson waited outside in the vehicle. There was sufficient evidence presented to the jury to conclude that the latter two offenses were the natural and probable consequence of the robbery which the three had planned.

We will now consider the effect of <u>Howard</u> and <u>Carson</u> upon the instant appeal. First, we note that under none of the varying versions testified to by the different witnesses did the defendant do other than assist in the crime, thus, justifying the trial court's giving the criminal responsibility instruction to the jury.

In this case, the defendant was convicted of felony murder, not first degree premeditated murder as in <u>Howard</u>. In <u>Commonwealth v. Allen</u>, 717 N.E.2d 657 (Mass. 1999), the Massachusetts Supreme Court considered a similar situation, the defendant, who had been convicted of armed robbery and felony murder in the first degree, claiming error because the trial court had not instructed that the jury must find that the death of the victim of a homicide was a natural and probable consequence of armed robbery:

> We reject the defendant's argument that there must be a new trial because the jury instructions did not include an instruction that required a finding that Bester's death was a "natural and probable consequence" of the armed robbery. Such an instruction is necessary where the evidence raises a legitimate question that a victim's death was proximately caused by the felony underlying the felony-murder charge. But no such question exists when, as here, the victim of an armed robbery, an inherently dangerous common-law felony, is killed during the commission of the robbery. In this situation, instructing the jury on proximate cause would be superfluous and might confuse them as they deliberated the elements of felony-murder.

-18-

Id. at 662 (citations omitted).

We agree with this reasoning. The proof raised no question as to whether the victim died as the result of injuries he received during the course of the especially aggravated robbery. Defense counsel did not request such an instruction. Further, we note that the trial court specifically instructed the jury that to find the defendant guilty of felony murder, it must find "that the killing was closely connected to the alleged robbery and was not a separate, distinct and independent event." That felony murder occupies a special status was also recognized in Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law, § 6.8(b), at 159 (1987) (footnotes omitted):

> Two striking exceptions to the general rules [of the "natural and probable" consequence rule of accomplice liability] discussed above are felony-murder and misdemeanor-manslaughter, for they do permit conviction for a homicide occurring in the execution of a felony or dangerous misdemeanor without any showing that the defendant intentionally, knowingly, recklessly, or even negligently caused the death.

We conclude, as did our supreme court in Carson, 950 S.W.2d at 956, that the evidence was sufficient to show that the subsequent offense, here the felony murder, was the natural and probable consequence of the robbery.

Accordingly, we conclude that if the trial court erred in not instructing the jury that to convict the defendant of felony murder, they must determine that the death of the victim was a "natural and probable consequence" of especially aggravated robbery, such error was harmless, particularly in light of the facts of this case.

The defendant argues also that we should reverse her conviction for especially aggravated robbery because the criminal responsibility instruction for this charge, like that of the instruction for felony murder, also omitted the "natural and probable consequences" element. Although the defendant is correct that neither charge included this language, she overlooks the rationale for this instruction, which is that when a defendant is charged with both a target crime as well as others for which co-defendants were the actual perpetrators, the "natural and probable" instruction is an element only of the other crimes, not of the target crime, for which the pattern jury instruction for criminal responsibility is adequate.

This assignment is without merit.

### III. Sufficiency of the Evidence

The final issue presented by the defendant is that the evidence is insufficient to sustain her convictions for felony murder and especially aggravated robbery.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Previously, we have discussed in detail the proof presented during the trial of this matter. Karen Verklas testified that she saw the defendant trying to pry open the victim's hand as he struggled with Jerry Graves, who had a pistol, on the sofa. She saw Graves and the defendant leave the apartment, and the victim, who was bloody, come out, leaning on the doorway. Robert Richards

also testified that the defendant appeared in the apartment after Jerry Graves wrestled with the victim on the sofa, hitting the victim in the head. Richards said that the defendant was trying to pry open the victim's hand and said to Graves, "How much [money] has he got on him?" Soon afterwards, Graves and the defendant left the apartment, and Richards saw the victim, covered in blood, stagger to the apartment door. This testimony, combined with the other evidence set out in this opinion, is sufficient for a reasonable jury to have concluded that the defendant was guilty of felony murder and especially aggravated robbery.

## CONCLUSION

Based upon the reasoning and authorities set out herein, we affirm the defendant's convictions for especially aggravated robbery and felony murder.

_____
ALAN E. GLENN, JUDGE